IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

AMANDA J.,[1]                        )
        Plaintiff,            )    Civil Action No. 4:21-cv-000034
                                     )
v.                                   )    REPORT & RECOMMENDATION
                                     )
KILOLO KIJAKAZI,                     )    By:    Joel C. Hoppe
Acting Commissioner of Social Security,  )           United States Magistrate Judge
        Defendant.            )

      Plaintiff Amanda J. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying her application for supplemental security

income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case

is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative

record, the parties' filings, and the applicable law, I find that the Commissioner's decision is

supported by substantial evidence. Accordingly, I respectfully recommend that the presiding

District Judge affirm the decision.

## I. Standard of Review

      The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

1

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

This case involves Amanda's fourth application for disability benefits since 2013. *See* Administrative Record ("R.") 91. She filed this SSI claim in March 2019, R. 188–95, alleging that she was disabled from a remote brain injury, diabetes, a thyroid condition, and a learning disorder, R. 90. Amanda was thirty-eight years old, or a "younger person" under the regulations, at the time. R. 90; 20 C.F.R. § 416.963(c). Disability Determination Services ("DDS"), the state agency, denied her claim initially in August 2019, R. 88–103, and upon reconsideration in February 2020, R. 104–123. On September 16, 2020, Amanda appeared with counsel and testified by telephone at an administrative hearing before ALJ H. Munday. *See* R. 40–82. A vocational expert ("VE") also testified at this telephonic hearing. R. 75–81.

ALJ Munday issued an unfavorable decision on December 9, 2020. *See* R. 10–29. She found that Amanda had the following severe medically determinable impairments ("MDI") since March 2019: degenerative disc disease, osteoarthritis of the bilateral knees, obesity, borderline intellectual functioning, depression, anxiety, and schizoaffective disorder. R. 13. She also found that Amanda's fibromyalgia was a "non-severe impairment[]" during this time because it was "only recently diagnosed in July 2020 during a physical medicine exam" where Amanda "had

3

normal gait, strength, and reflexes . . . despite some shoulder, knee, and elbow tenderness," the condition "did not cause signs on exams that even minimally affected [Amanda's] ability to carry out basic[] work-related activities 12 months or more, and [it was] adequately controlled with conservative treatment" limited to "recommendations to lose weight, exercise, and consider a trial of Savella" in July 2020. *Id.* ("[A]ll of her [other] treatment notes generally noted normal strength and sensation without indication of tender points typical of fibromyalgia.").

None of Amanda's severe MDIs met or medically equaled a relevant Listing. R. 13–16 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 12.03, 12.04, 12.06, 12.11). As part of her Listings analysis, ALJ Munday found that Amanda's severe mental MDIs caused "moderate" limitations in her overall abilities to understand, remember, or apply information; to interact with other people; to concentrate, persist, or maintain pace; and to adapt or manage herself. R. 15–16 (citing R. 237–44, 892–97, 1027). ALJ Munday then evaluated Amanda's residual functional capacity ("RFC") and found that she could perform "light"[3] work that required

> lifting/carrying 20 pounds occasionally and 10 pounds frequently; standing and walking 4 hours in an 8-hour workday; occasional balancing, stooping, kneeling, crouching, and climbing ramps/stairs; no crawling; no climbing ladders, ropes, or scaffolds; occasional push/pull activities with the lower extremities; occasional exposure to vibrations; [and] occasional exposure to hazardous conditions, including unprotected heights and moving machinery.

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). "The full range of light work requires the ability to stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)). An RFC that allows the claimant to lift up to twenty pounds at one time, but restricts total standing and walking to fewer than six hours during an eight-hour workday, *see* R. 16, 22, is often characterized as permitting a "reduced" or "limited" range of light work because the person's capacities for standing/walking fall between what is needed to do "sedentary" work and what is needed to perform the "full range of light work." *E.g.*, *Neal*, 2010 WL 1759582, at *2 (explaining that a four-hour standing/walking restriction "exceed[s] the definition of sedentary work" because it permits the claimant to "stand or walk for more than two hours per workday," but "fall[s] short of the full range of light work because [the claimant] cannot stand or walk for six hours per workday").

R. 16. She also found that Amanda could "perform simple routine tasks; low stress work, defined as occasional workplace changes; and [tolerate] frequent interaction with the general public." *Id.*

This RFC's restriction to light, unskilled work ruled out Amanda returning to her past work as an institution cook. R. 28 (citing R. 77). Relying on the VE's testimony, however, ALJ Munday found that Amanda could transition to other occupations (sorter, checker, marker) that offered a significant number of jobs in the national economy. R. 28–29 (citing R. 77–78). Thus, ALJ Munday concluded that Amanda was not disabled between March 2019 and December 2020. R. 29. The Appeals Council declined review, R. 1–4, and this appeal followed.

### III. Discussion

Amanda challenges the Commissioner's denial of benefits on three independent grounds. *See generally* Pl.'s Br. 20–26 (*Mascio* error in mental RFC assessment); *id.* at 26–29 (failure to consider fibromyalgia in physical RFC assessment); *id.* at 29–34 (analysis of daily activities and other evidence in RFC assessment), ECF No. 17. First, she argues that ALJ Munday did not explain how an RFC limiting Amanda to "simple, routine tasks; low stress work, defined as occasional workplace changes; and frequent interaction with the general public," R. 16, reflects Amanda's "moderate limitations" in her broader abilities to interact with others; maintain concentration, persistence, or pace; and adapt or manage herself, R. 15–16. *See* Pl.'s Br. 20–26. She also asserts that ALJ Munday did "not address her ability to actually sustain [such] work activity" during a normal eight-hour workday. *Id.* at 26. Second, Amanda argues ALJ Munday erroneously found at step two that Amanda's fibromyalgia was "not a medically determinable impairment" at all, and therefore also erred by "not consider[ing] the impact of the pain and limitations stemming from" fibromyalgia in evaluating her physical RFC. *Id.* at 27; *see also id.* at 28–29. She also asserts that ALJ Munday "failed to assess" whether her medical "impairments

would result in episodes of pain that would necessitate [her] taking" unreasonable breaks or otherwise doing "work tasks at an unacceptable rate." *Id.* at 29; *see id.* at 28 ("The ALJ was required to make specific findings regarding whether plaintiff's impairments would result in episodes of pain that would necessitate plaintiff taking breaks and[,] if so, how often those breaks would occur and the ALJ failed to make these specific findings."). Finally, she argues that ALJ Munday's RFC assessment improperly considered the type of daily activities that Amanda performed without also considering the limited extent to which Amanda performed them on her own. *See id.* at 30–34. She also asserts that ALJ Munday did not explain how Amanda's ability to do those "limited, intermittent activities" supports the ALJ's conclusion that Amanda could do light, unskilled work for eight hours a day, five days a week. *Id.* at 32. Amanda's arguments are not persuasive.

A.    *Step Two: Non-severe Fibromyalgia*

At step two, the ALJ determines whether the claimant has a "severe medically determinable physical or mental impairment . . . or combination or impairments," 20 C.F.R. § 416.920(a)(4)(ii). *See Stemple v. Astrue*, 475 F. Supp. 2d 527, 534 (D. Md. 2007). A medically determinable impairment ("MDI") is an anatomical, physiological, or psychological abnormality that must be established by objective medical evidence consisting of signs, symptoms, and laboratory findings from an acceptable medical source. 20 C.F.R. § 416.921. If the claimant has at least one MDI, the "severity regulation" then requires her to show that the impairment(s) "'significantly limits' 'the abilities and aptitudes necessary to do most jobs.'" *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b) (1986)); *see* 20 C.F.R. § 416.922(a)–(b). This "is a threshold question with a de minimis severity requirement." *Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) (citing *Bowen*, 482 U.S. at 153–54).

Even so, "medical conditions alone do not entitle a claimant to disability benefits; '[t]here must be a showing of related functional loss'" for an MDI to be found severe. *Id.* at 229–30 (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)). *See Sheila W. v. Comm'r of Soc. Sec.*, No. 4:19cv12, 2020 WL 5525165, at *8–9 (W.D. Va. Sept. 11, 2020) (collecting cases).

An ALJ may find an MDI to be "not severe" when she logically explains why that impairment "is a *slight abnormality* [that] has such *a minimal effect* on the individual that it would not be expected to interfere" with her ability, *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis omitted), to do basic work activities for at least twelve continuous months, *see* SSR 96-3p, 1996 WL 374181, at *1–2 (July 2, 1996). Even when an MDI is properly found to be non-severe, the ALJ still must consider the extent, if any, to which that MDI and related symptoms impact the claimant's ability to do more specific work-related functions in an ordinary workplace on a regular and continuing basis. *See Woods v. Berryhill*, 888 F.3d 686, 689 (4th Cir. 2018); 20 C.F.R. § 416.945; SSR 96-8p, 1996 WL 374184, at *2–3, *5 (July 2, 1996). Conversely, the ALJ will not consider whether a condition that is *not* an MDI at all—perhaps because the claimant's record contains no objective medical evidence showing its existence— could be reasonably expected to cause the claimant's alleged symptoms or otherwise impacts her ability to work. *See generally Woody N. v. Berryhill*, No. 4:17cv44, 2018 WL 10806836, at *5 (W.D. Va. Aug. 22, 2018) (citing *Craig v. Chater*, 76 F.3d 585, 591–92, 594–95 (4th Cir. 1996)).

\*

Amanda misreads the record in arguing ALJ Munday found that her fibromyalgia was "not a medically determinable impairment" and therefore also "did not consider the impact of the pain and limitations stemming from fibromyalgia" in evaluating her RFC. *See* Pl.'s Br. 27–29 (citing R. 13). ALJ Munday found that Amanda's fibromyalgia was a "*non-severe* impairment[]"

7

during the relevant time, R. 13 (emphasis added), because it "did not cause signs on exams that

even minimally affected [Amanda's] ability to carry out basic[] work-related activities for 12

months or more, and [it was] adequately controlled with conservative treatment," *id.* More

specifically, she explained that Amanda was "only recently diagnosed" with fibromyalgia in July

2020 after she exhibited "some shoulder, knee, and elbow tenderness" on one physical exam and

her "treatment at that time was limited to recommendations to lose weight, exercise, and consider

a trial of Savella." *Id.* (citing R. 1192–93). "[A]ll of her [other] treatment notes generally noted

normal strength and sensation without indication of tender points typical of fibromyalgia." *Id.*

Later in her decision, ALJ Munday found that Amanda's MDIs could reasonably be

expected to cause [her] alleged symptoms," R. 18, including diffuse body pain typical of

fibromyalgia, *see* R. 17, 21 (citing R. 60–61, 1188–93), but that Amanda's statements describing

"the intensity, persistence, and limiting effects" of those symptoms were "not entirely consistent

with" other relevant evidence in the record, including her "wide range of reported daily

activities," R. 18 (citing R. 906, 908, 959, 980, 992, 1001, 1004, 1170). The fact that a person

with fibromyalgia can persist in normal daily activities may be a legitimate reason for the ALJ to

doubt that person's complaints of disabling "pain and limitations stemming from her

fibromyalgia," Pl.'s Br. 27. *Cf. Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 97, 99–102

(4th Cir. 2020) (holding that "ALJs may not rely on objective medical evidence (or the lack

thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints

regarding symptoms of fibromyalgia or some other disease that does not produce such evidence,"

but explaining that ALJs may consider the nature and extent of the claimant's reported daily

activities in determining her RFC).

ALJ Munday also summarized the July 23, 2020, treatment note in which Amanda was first diagnosed with fibromyalgia.[4] R. 21 (citing R. 1188–93 (Ex. B22F)). At that visit, Amanda complained of persistent "pain all over mostly from her thighs down to her toes" for the past year. R. 1188. Her physical exam was essentially normal, except for reported tenderness at the shoulders, knees, and elbows and subjective "complaints of pain [on the] reflex hammer exam." R. 1191. Richard Weiss, M.D., diagnosed fibromyalgia and chronic bilateral knee pain. R. 1192. He recommended "conservative treatment" for Amanda's symptoms, including weight loss, exercise, stretching, and at-home remedies like ice, heat, and foam-roller massage. *Id.* Dr. Weiss also gave Amanda a trial of Savella and noted that Lyrica and gabapentin were other options if Savella did not help. *Id.* On August 30, Amanda told her orthopedist, Jesse Seamon, M.D., that she "will not take [Savella] due to concerns over side effects," but she was "willing to try [the] gabapentin or Lyrica" that Dr. Weiss suggested as "back up options." R. 1219; *see* R. 20 (citing R. 1219). ALJ Munday specifically cited this and other relevant evidence to support her findings that Amanda's fibromyalgia was a "non-severe" MDI, *see* R. 18, and that Amanda retained the RFC to do "light work with additional standing, walking, postural, push/pull, and environmental restrictions" despite her physical impairments, R. 22. *See, e.g.*, R. 21, 25–26 (citing R. 505–10, 840–43, 930–35, 1101, 1188–93, 1198–1202).

---

[4] Contrary to Amanda's assertions, neither the "state agency physicians [nor the] consultative examiners" found that Amanda's "fibromyalgia [was] a medically determinable impairment" or that her impairments "impose[d] manipulative limitations," Pl.'s Br. 28. *See* R. 97–102 (Aug. 2019); R. 115–19 (Feb. 2020); R. 505–09 (Jan. 2020). Indeed, the first mention of "possible fibromyalgia," Pl.'s Br. 17 (quoting R. 1141), appears in a June 18, 2020, treatment note showing that Amanda sought advice about chronic bilateral knee pain and also reported a "[g]eneral aching in numerous other joints and malaise over the past year with feelings of fatigue," R. 1141. Five days later, the same physician referred Amanda to "physiatry for evaluation [of] possible fibromyalgia" after she reported "more general aches and pains outside of the knee in certain trigger points including both elbows, shoulder areas, posterior hips and lower back, [and] sometimes lower leg." R. 1135. Richard Weiss, M.D., diagnosed Amanda with "fibromyalgia, chronic pain" at an office visit on July 23, 2020. R. 1192.

Amanda does not challenge ALJ Munday's decision in this regard. *See* Pl.'s Br. 27–29. Nor does she point to any specific evidence of fibromyalgia-related symptoms or functional limitations that ALJ Munday might have overlooked in finding that it was a "non-severe impairment[]," R. 13, during the relevant time. *Cf. Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (finding no reversible error where ALJ's allegedly erroneous factual finding was "amply supported by the record" and claimant "failed to point to *any* specific piece of evidence not considered by the [ALJ] that might have changed the outcome of his disability claim"). She merely notes that she was diagnosed with fibromyalgia, *see* Pl.'s Br. 27–29, which ALJ Munday acknowledged in finding that MDI to be non-severe, R. 13.

No treatment note or medical opinion in the record suggests that Amanda's fibromyalgia "symptoms either 'significantly' limited her functional abilities or caused specific limitations beyond those reflected in the RFC finding," *Sheila W.*, 2020 WL 5525165, at *9. For example, Dr. Seamon's August 2020 medical opinion attributed Amanda's functional limitations to pain from bilateral knee osteoarthritis and did not mention her recent fibromyalgia diagnosis. *See* R. 1198–1202. ALJ Munday's RFC finding, R. 16, is consistent with Dr. Seamon's opinion that Amanda could stand/walk for four hours in an eight-hour workday; occasionally balance, kneel, crouch, and stoop, but never crawl or climb ladders, ropes, or scaffolds; had "limited" ability to push/pull with her lower extremities; needed "limited" exposure to vibrations; and did not need to take rest periods on top of those normally "scheduled at approximately 2 hour intervals" during the work day, R. 1198–1201, as well as his implied conclusion that Amanda did not need a "medically required hand-held assistive device . . . for ambulation," R. 1198. *See* R. 16, 18 (citing R. 1198). ALJ Munday also explained that she was not "persuaded" by Dr. Seamon's opinion that Amanda could only "occasionally" lift/carry ten pounds and "frequently" lift/carry

fewer than ten pounds, R. 1198, because it was inconsistent with Amanda's "normal strength during primary care visits and reports of regular exercise at the gym to work on her upper body strength," R. 27 (citations omitted). ALJ Munday instead was persuaded by two other medical opinions that Amanda could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds, R. 25–26 (citing R. 118–19, 509), because they were supported by mixed, minimally abnormal findings on exams with mild deficits on imaging studies, *see id.* None of those physicians opined that Amanda had fibromyalgia during the relevant time. R. 118–19, 509. Accordingly, I find no error in ALJ Munday's analysis of Amanda's fibromyalgia symptoms or their functionally limiting effects, if any. *See Sheila W.*, 2020 WL 5525165, at *8–9.

B.    *RFC Assessment*

Amanda's other arguments challenge ALJ Munday's RFC assessment. *See generally* Pl.'s Br. 20–26, 29–34. A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite her MDIs and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller*, 459 F. App'x at 230–31, and it should reflect specific, credibly established "restrictions caused by [MDIs] and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). The ALJ's written decision "must include a narrative discussion" describing how specific, relevant evidence "supports each conclusion" in the RFC assessment, *Woods*, 888 F.3d at 694 (quotation marks omitted), and logically explain how the ALJ weighed other "evidence that points to a claimant's disability," *Stoker v. Saul*, 833 F. App'x 383, 386 (4th Cir. 2020) (citing *Lewis*, 858 F.3d at 869). *See, e.g.*,

11

*Lewis*, 858 F.3d at 869 (remanding where the ALJ impermissibly "cherrypick[ed] facts" supporting his "finding of nondisability while ignoring evidence that point[ed] to a disability finding" and failed to explain how those cited facts reasonably supported specific RFC findings).

An ALJ's conclusion that the claimant's RFC renders her "not disabled" will, by definition, "implicitly contain[] a finding" that the claimant is mentally and "physically able to work an eight hour day" five days a week. *Hines*, 453 F.3d at 563 (citing SSR 96-8p, 1996 WL 374184, at *1); *see, e.g.*, *Elgie B. v. Saul*, Civ. No. TMD-19-847, 2020 WL 2490106, at *6 (D. Md. May 14, 2020). The ALJ's failure to *expressly* evaluate the claimant's remaining ability to "perform certain functions . . . for a full work day," *Mascio*, 780 F.3d at 637, may be reversible error if it frustrates meaningful judicial review. *See, e.g.*, *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016) (reversing in part because the ALJ "never made specific findings about whether Monroe's [severe] apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur"). Nonetheless, it is generally the claimant's burden to identify "functional limitations that should have been included in the RFC [finding]," *McAnally v. Astrue*, 241 F. App'x 515, 518 (10th Cir. 2007); *see also Hartman v. Colvin*, No. 5:13cv109, 2015 WL 877360, at *7 (W.D. Va. Mar. 2, 2015), and to explain why the ALJ's failure to include those limitations is reversible error, *see Reid*, 769 F.3d at 865.

*

Amanda first argues that ALJ Munday did not explain how an RFC for "simple, routine tasks; low stress work, defined as occasional workplace changes; and frequent interaction with the general public," R. 16, reflects Amanda's "moderate limitations" in her broader abilities to interact with others; maintain concentration, persistence, or pace; and adapt or manage herself,

12

Pl.'s Br. 21 (citing R. 15–16). *See generally* Pl.'s Br. 20–26.[5] She also asserts that ALJ Munday

did "not address her ability to actually sustain [such] work activity" during a normal eight-hour

workday. *Id.* at 26. This argument stems from the Fourth Circuit's decision in *Mascio v. Colvin*,

780 F.3d 632 (4th Cir. 2015).

As relevant here, *Mascio* holds that an ALJ who at step three finds the claimant's mental

MDI(s) causes at least a "moderate" limitation in her general ability to maintain concentration,

persistence, or pace ("CPP") must either specifically account for that work-related limitation in

the RFC finding or explain why such a restriction is unnecessary. 780 F.3d at 638. Restricting

the claimant to "simple, routine tasks or unskilled work," without additional explanation, is not

sufficient because "the ability to perform simple tasks differs from the ability to stay on task.

Only the latter limitation would account for a claimant's [at least moderate] limitation in

concentration, persistence, or pace." *Id.* (internal quotation marks omitted). Thus, the ALJ's

written decision must include a narrative discussion, citing relevant evidence in the record,

explaining either how the RFC reflects the ALJ's finding that the claimant's mental MDI(s)

causes "moderate" (or more) overall limitations sustaining CPP or why, notwithstanding that

prior finding, this limitation "does not affect" the claimant's ability to "stay on task" for a full

workday and normal workweek. *Id.*; *see, e.g.*, *Lonie B. v. Comm'r of Soc. Sec. Admin.*, No. DLB-

19-1424, 2020 WL 2097683, at *4 (D. Md. May 1, 2020) (remanding under *Mascio* where ALJ

discussed relevant medical evidence, but "offered no explanation as to why Plaintiff's issues

with concentration and persistence did not affect his ability to sustain work over an eight-hour

---

[5] Parts of this argument relate more to ALJ Munday's finding that Amanda's allegedly debilitating symptoms were "inconsistent with her wide range of reported activities," R. 18; *see* R. 19, than they do to the potential *Mascio* error. *See, e.g.*, Pl.'s Br. 21 (asserting that ALJ Munday "failed to explain how her RFC findings address or accommodate . . . *the fact that plaintiff requires considerable assistance* just to perform normal daily activities (emphasis added) (citing R. 561–795, 951–1023, 1030–46, 1066–68, 1160–84, 1224–30)). That argument will be addressed separately below.

workday"). Some district courts within the Fourth Circuit have extended *Mascio*'s rationale to cases where the ALJ found that the claimant's mental MDI(s) causes at least "moderate" limitations in her overall ability to interact with people but the ALJ's RFC finding did not include any restrictions on her social interaction in the workplace. *See, e.g.*, *Panna v. Colvin*, No. 1:14cv229, 2015 WL 5714403, at *3–4 (W.D.N.C. Aug. 31, 2015), *adopted*, 2015 WL 5725246 (W.D.N.C. Sept. 29, 2015).

  *1. Relevant Evidence*

  When Amanda applied for SSI in March 2019, she alleged disability based on a remote brain injury, diabetes, a thyroid condition, and a learning disorder. *See* R. 90. Ten years earlier, in March 2009, Amanda was in a car accident and hospitalized for a few days to monitor her injuries. *See* R. 320–46. She suffered "multiple facial lacerations and scalp avulsion," R. 320, but she "was not diagnosed with a brain injury," R. 96; *see* R. 355–56, 370.

  In August 2017, Amanda established care with Piedmont Community Services ("PCS") because of "increased depression and anxiety," self-isolation, crying spells, "feelings of hopelessness and worthlessness," and trouble sleeping. R. 562–63. At the time, Amanda spent most weekdays at We Care, Inc., which is a "non-professional, peer-operated organization . . . devoted to helping individuals reach or maintain recovery." R. 564; *see* R. 228. She did not need help caring for herself, but she "relied on We Care" for transportation and help doing laundry. R. 565. She had trouble remembering to take her medication. *Id.* That October, Pravinchandra Patel, M.D., diagnosed Amanda with major depressive disorder, unspecified anxiety disorder, and unspecified personality disorder with "mixed traits." R. 595. He restarted Amanda on once-daily citalopram (Celexa) for anxiety and depression. *See* R. 594–95. Dr. Patel later increased the dose

of Celexa and added Vistaril (hydroxyzine) as needed for insomnia. R. 624. Amanda frequently

reported that she did not take those medications. *See, e.g.*, R. 640, 653, 662, 671, 677, 689, 743.

In December 2017, Amanda started working as a cook at We Care's residential recovery

center. *See* R. 218, 228–29, 635, 640. She twice reported that work was "going pretty well"

despite her "symptoms [and] stressors," R. 750 (Mar. 12, 2019). Counselors at PCS consistently

observed that Amanda's mood was "normal" and noted no concerns about "lack of self care,"

impulse control, or self-destructive behavior. *See, e.g.*, R. 643, 655, 662, 674, 677, 692, 697, 706,

733, 745 (Dec. 2017–Feb. 2019). Dr. Patel's findings on mental-status exams showed normal

speech, "fair" to "good" judgment and insight, "normal" or "euthymic" mood and affect,

"appropriate, logical" thought process without signs of "abnormal," "disturbing," or "psychotic

thoughts," and "intact" or "adequate" memory and attention span. *See* R. 666 (Jan. 2018); R.

685–86 (May 2018); R. 715–16, 720–21 (Aug. 2018); R. 753–74 (Mar. 2019).

Amanda worked until March 2019. *See* R. 50, 217, 750, 759. On March 29, she told

Tracy Lange, NP, that "[s]he was working at Horizon's and they are doing away with the kitchen

job so she is losing her job [and] her PCS worker is helping her get SSI." R. 526. Amanda later

reported that she stopped working "because of [her] condition(s)," R. 217, most notably "because

of [her] mental illness [she] yelled at coworkers and members also [her] knee would give out and

[she] fell a lot," R. 235 (June 2019). *See also* R. 50–51 (fall risk); R. 505 (knee pain); R. 983

("health reasons"); R. 1025 (knee pain, fall risk, and getting "frustrated and 'angry' with people

for no reason"). In May 2019, Amanda told a PCS counselor that her remote brain injury was

"starting to cause her problems" with "memory and headaches," R. 766, as well as dizziness

while standing or walking, R. 767. She still attended We Care once or twice a week. *Id.*

On May 29, Amanda went to PCS for "crisis" services, reporting "increased depression," family stress, "and hurtful things said by neighbors and friends." R. 771, 774. She specifically denied "expressions of aggression or anger," "fight[ing] or attempt[ing] to fight," and "threats [or] thoughts or plans to harm" herself or others. R. 774. She was "tearful" and "depressed" on exam, but her speech, thought process and content, affect, memory, insight, and judgment were normal. R. 776. The crisis counselor suggested that Amanda talk to Dr. Patel about changing her medications. R. 777. The next day, Dr. Patel continued Amanda on her daily dose of Celexa, but he told her to increase the Vistaril to 50mg as needed for anxiety and insomnia. R. 788 (May 30, 2019). His findings on that day's mental-status exam were normal, including "cooperative" and "friendly" attitude, normal speech rate and volume, "good" eye contact, intact memory, "good" attention and concentration, and "euthymic" mood with "appropriate" affect. R. 785. Amanda's primary care provider noted similar findings on exam in early June 2019. R. 806. Amanda told the provider that she "does well with the Celexa," but "she [had] refused" Dr. Patel's purported efforts "to put her on 3-4 sedating medications" for anxiety and depression. R. 805.

Later that month, Amanda completed an Adult Function Report for DDS. R. 237–44. She alleged that her medical conditions impacted all her functional capacities, including those for reaching, sitting, talking, hearing, remembering things, using her hands, and getting along with people. R. 242. She needed physical help bathing, dressing, and feeding herself, and she often forgot to bathe, brush her teeth, and take her medications. R. 238–39. She did not cook for herself because she got dizzy and fell. R. 239. She reported that she did not "do any" household chores, but a friend helped her do chores "once a week." *Id.* She needed encouragement to do those things "because [her] mental illness takes over." *Id.* Amanda left her house only to check the mail or for medical appointments. R. 240–41. She also went grocery shopping once a month.

16

R. 240. She needed someone to go with her on those outings, R. 240, but she never socialized or spent time with anyone, R. 241. She did not "like being around people" because she did not "get along" with anyone, R. 242, especially not authority figures, R. 243 ("I don't deal with none of these people."). Amanda would "get short with people," R. 242, and she had been fired from a job because she "yell[s] at people instead of talking," R. 243.

On July 1, 2019, Amanda connected with Epic Health Partners, Inc. ("Epic") for their "mental health skill building services." R. 892. She reported diagnoses of "Bipolar Disorder I, Recurrent, Mixed with Psychotic Features" and Post-Traumatic Stress Disorder. *Id.*; *see also* R. 895. *But see* R. 786–87, 1026. Amanda's "symptoms related to her Bipolar Disorder" included "severe mood swings, irritability, outbursts of anger, feeling detached form others, anxiety, insomnia, hallucinations," and frequent isolating or avoidant behaviors. R. 892–93. Anxiety made it "difficult for her to take care of things at home or to get along with other people," whereas depression made it "extremely difficult" to do those things. R. 892. She reported trouble "developing and maintaining relationships due to her aggressive outbursts" and low frustration tolerance. R. 893. On exam, Amanda appeared "anxious," "disheveled," and "restless," but she was "cooperative" and exhibited normal eye contact, speech, attention, and memory. R. 895. The social worker opined that Amanda needed "individualized goal directed training in order to acquire or maintain self-regulation of basic living skills" like "appropriate use of social skills" and tools to "manage personal hygiene, food preparation, money management," and access community resources. R. 896. She "recommended that Amanda receive 15 hours weekly for six months, or as clinical[ly] needed." *Id.* The social worker's report shows Amanda was diagnosed with "schizoaffective disorder, bipolar type" on July 1, 2019. R. 902.

17

Amanda connected with Jaleesa, her mental-health skill builder, in late July 2019. R. 903; *see* R. 951. That September, Jaleesa reported that "Amanda complies with taking her medication and [could] locate community resources on her own." R. 903. "[S]he attends We Care about once or twice a week, [takes] a computer class when it is available, attends church occasionally, socializes with tenants in her apartment complex, and goes places with her friends where she interacts with others." R. 906. "Amanda has a very outgoing personality," *id.*, "enjoys talking to others and being around people," and makes friends easily because she "looks into another person's perspective other than just hers," R. 903. "She understands her boundaries and maintains eye contact when communicating." R. 906.

Amanda reported that her regular activities included "work[ing] out" at the gym "every morning," R 959 (Aug. 2019); *see also* R. 980 (Sept. 2019), preparing "home cooked meals" weekly, R. 906, cleaning her apartment and doing laundry once or twice a week, R. 908, and going to food banks, clothes pantries, and other places in the community that offered "financial assistance and hygiene products," R. 904. *See also* R. 956–57 (counselor noting that Amanda had "very mild" to "mild" problems functioning in these areas (Aug. 2019)). In September, Amanda "reported she [was] now treasurer for We [C]are and [would] also be helping with taking notes for the meetings." R. 980. She was also "anxiously waiting to hear . . . about starting the new classes at the Museum." *Id.* That October, Amanda was "attending [two] classes at the science museum" and still worked out "three times a week." R. 992. She had also "been working on organizing her home and cleaning it daily." *Id.* In November, she reported "attend[ing] a class for the past six weeks [on] Life Skills Training," R. 1001, at Southern Area for Aging, R. 1004. "Amanda sp[oke] highly about the class and seem[ed] to have learned skills on budgeting her money, medication, cleanliness, and [h]ygiene." R. 1001. She enjoyed the classes and would

"continue to work towards her certificate." R. 1004. That December, Jaleesa noted that Amanda

did "not isolate herself and love[d] to be out in the community weekly." R. 1033. She still

attended We Care twice a week, usually went "on community outings with program," and she

had "started back exercising about 1 to 2 times a week." R. 1036. Amanda had a "very sociable

personality" and could "communicate her concerns and feelings daily as she display[ed] active

listening and proper eye contact with others." *Id.* She also used "coping skills weekly[,] such as

exercise reading . . . hanging out with friends, meditation, etc.," and could "maintain and identify

appropriate relationships in her life." R. 1033. Amanda reported some trouble "completing her

general cleaning tasks weekly" because her house was cluttered. R. 1037; *see* R. 1027. She was

"not taking her psychiatric medications" because they "ma[de] her feel 'weird.'" R. 1039.

Amanda saw Trina Jackson, Ph.D., for a consultative psychological exam in January

2020. *See* R. 1024–28. Dr. Jackson described Amanda as "friendly, polite, and cooperative . . . ,

but concrete in her thinking and not very sophisticated cognitively. She did not appear to be

anxious or depressed; she made good eye contact and had good social skills." R. 1024. "Her

concentration was intact," and her long-term memory "appeared to be adequate" on exam, but

short-term memory was "not a strength for her" that day. R. 1027. Dr. Jackson also noted that

Amanda "doesn't pay close attention," answered questions that she did not fully understand, and

was "forgetful." R. 1026. Amanda endorsed "very poor frustration tolerance" and problems

coping well with stress "so she ends up becoming angry and upset with people easily." *Id.* Her

speech, mood, affect, and thought content were all normal on exam. R. 1027. Dr. Jackson

diagnosed Amanda with borderline intellectual functioning ("BIF") and an adjustment disorder

mixed with anxiety and depressed mood. *Id.* Amanda did not meet the diagnostic criteria for

PTSD. *See id.* Based on her exam, Dr. Jackson opined that Amanda "would have difficulty

managing complex or simple tasks unless they were specifically demonstrated for her. She [was] inconsistent in her performance, ga[ve] up easily, and lack[ed] motivation. . . . Her emotions were under good control and she [could] concentrate adequately." *Id.* Dr. Jackson did not identify any impairment-related limitations on Amanda's ability to interact with others, maintain concentration, persistence, or pace when doing simple tasks, or adapt or manage herself. *See* R. 1026–27.

A few days later, Amanda established care with Shama Saiyed, M.D., a psychiatrist at Epic, to manage her psychotropic medications. *See* R. 1042–46 (Jan. 28, 2020). Amanda endorsed many of the same psychiatric symptoms and functional limitations as at her initial visit with Epic's social worker in July 2019, R. 892–93, 898, including "anger and angry episodes," crying spells, "grandiosity," "periods of extreme restlessness or agitation," trouble concentrating, excessive worry, "episodes of bizarre behavior," predominately "dysphoric mood," "pressured" speech, and symptoms of "psychotic process," most notably paranoia, visual hallucinations, and a "belief that thoughts are being inserted into her mind" or extracted from her mind, R. 1043. Some of these symptoms had improved, but others had gotten worse over the past five months. *See id.* Dr. Saiyed's exam findings were normal. R. 1045. Amanda had "no apparent serious mental status abnormalities"; she exhibited neither anxiety, "depression[,] nor mood elevation"; her behavior was "generally appropriate" and showed "no signs of hyperactivity"; and her speech, memory, attention span, insight, and judgment were all intact. *Id.* Dr. Saiyed opined that Amanda's diagnosed anxiety disorder, major depressive disorder, and "schizoaffective disorder, bipolar type" caused "relatively mild interference with [Amanda's] interpersonal/occupational functioning." *Id.* Thus, she recommended that Amanda continue outpatient counseling. *See id.*

("Psychopharmacology: [blank]."). The next day, Amanda told another provider that Dr. Saiyed

had started her on Latuda, Cymbalta, and Trazadone. R. 1049.

The DDS psychologist who reviewed Amanda's records in February 2020 opined that her

severe mental MDIs caused a "mild" limitation in her broader ability to interact with others and

"moderate" limitations in her broader abilities to maintain CPP and adapt and manage herself. R.

116; *see also* R. 98 (Aug. 2019). Despite those limitations, Amanda could do "simple, routine

work," R. 115; *see also* R. 101 (Aug. 2019), "maintain attention and concentration for 2 hour

periods to complete an 8 hour day," and "complete a full workweek with minimal interruption

from" her psychological symptoms, R. 120–21; *see also* R. 101 ("She remains capable of 1 and 2

step tasks throughout a 40 hour workweek." (Aug. 2019)), but she needed "occasional assistance

with changes and with transportation," R. 121. Amanda had no limitations interacting with

people in the workplace. R. 121; *accord* R. 101 (Aug. 2019).

Amanda saw Dr. Saiyed about once a month from March to September 2020. *See*

*generally* R. 1173–84, 1224–30. Each progress note documents essentially the same subjective

complaints, albeit with varying degrees of symptom improvement or deterioration, that Amanda

reported at her first visit to Epic. R. 1173, 1175, 1177, 179, 1181, 1183, 1224, 1129. Dr. Saiyed

repeatedly found that Amanda exhibited "no apparent serious mental status abnormalities"

during their telehealth visits. R. 1174, 1176, 1178, 1180, 1181–84, 1224–25, 1229–30. On the

contrary, her behavior, grooming, speech, and thought content were always "appropriate"; she

never exhibited signs of anxiety, hyperactivity, depression, or "mood elevation"; her memory,

insight, judgment, and associations were always "intact"; and she exhibited "normal attention

span" during every fifteen-minute session. *See id.* Dr. Saiyed's notes occasionally reference

Amanda's positive response to "medications" generally, but they do not list specific drugs. *See,*

*e.g.*, R. 1175, 1179. In July 2020, Amanda told a social worker at Epic that Dr. Saiyed prescribed

Celexa, Wellbutrin, and melatonin. R. 1160. *But see* R. 1163. Jaleesa reminded Amanda to take

her medications as directed. R. 1160. The social worker noted that Amanda showed "mild

improvement in maintaining normal interpersonal skills," but she still needed one-on-one support

to obtain and maintain stability. R. 1160.

In September 2020, Amanda testified that she could not work anymore because her

"whole body hurt[] all the time." R. 60 (ALJ hearing transcript). The "constant," severe pain was

especially bad in both knees, R. 59–60, and she experienced painful muscle spasms that caused

her hands and feet to "curl up," R. 60. She tried pain relievers (meloxicam, ibuprofen,

duloxetine), but they did not "help [her] pain at all." R. 60–61. Amanda could "hardly do

anything around the house," R. 59, but she could do some light cleaning if she took breaks or had

help, R. 73. She stayed in bed "at least four days a week." R. 67. Amanda was still "horribly"

depressed and anxious "on a daily basis." R. 70–71. She had crying spells "probably three times

a week," R. 70, and "panic attacks about two or three times a week," R. 71. The panic attacks

lasted "probably ten to fifteen minutes." R. 71. Amanda had "a very hard time concentrating" on

tasks, and she did not "like being around a bunch of people" because she worried people would

"judge" her. R. 72. She also got "frustrated too easy." *Id.*

Amanda testified that Jaleesa picked her up at home twice a week and took her "out in

the community" to run errands and go to doctor's appointments. R. 67–68. They also did

"activities together," R. 68, like working out at Planet Fitness and going to the park, *see* R. 66–

70. Amanda stopped going to Planet Fitness in the fall of 2019 because her insurance reduced

Jaleesa's hours. R. 69. Now it was "kinda hard for [her] to go" to the gym because she did not

"have transportation[,] for one, and then the places are limited because of COVID." R. 66.

Amanda denied ever going to the Science Museum or taking any "skill building classes" during the relevant time. *See* R. 69–70.

> 2. *The ALJ's Decision*

ALJ Munday discussed this evidence throughout her decision. *See generally* R. 15–27. At step two, she found that Amanda's anxiety, depression, BIF, and schizoaffective disorder were "severe" mental MDIs because they significantly limited her ability to do "basic work activities," R. 13, which according to the regulations include things like following "simple instructions," "responding appropriately to supervision, co-workers, and usual work situations," and "dealing with changes in a routine work setting," R. 20 C.F.R. § 416.922(b). At step three, ALJ Munday found that Amanda's severe mental MDIs caused "moderate" limitations in her overall abilities to maintain CPP, interact with others, and adapt or manage herself. R. 15–16. In choosing those ratings, ALJ Munday acknowledged that Amanda had described more extreme limitations in her statements to the agency, R. 15–16 (citing R. 237–44, testimony), but also found that Amanda had mostly normal mental status exams and that other evidence showed her functioning in those three broad areas was in fact higher than she alleged. R. 15 (citing R. 892–97, 1024–28).

Next ALJ Munday found that, notwithstanding Amanda's severe mental MDIs and "moderate" limitations overall, she could perform "simple, routine tasks" and "low stress work, defined as occasional workplace changes," and manage "frequent interaction with the general public." R. 16. She based these RFC findings primarily on the "mixed," but generally normal, signs on Amanda's mental status exams, which showed "only occasional thought, cognition, memory, mood, and affect deficits that usually occurred with situational stressors, as well as [Amanda's] positive response to conservative treatment of medications, rare therapy sessions, and regular skill building meetings without need for psychiatric hospitalizations," R. 24. She also

cited Amanda's "reported activities, which included cleaning her home, attending classes, . . .
working out regularly, and participating in outings in the community." R. 27.

ALJ Munday considered Dr. Jackson's and the DDS psychologists' medical opinions, all
of which indicated Amanda had no limitations interacting with people in an ordinary workplace.
R. 25–26 (citing R. 101, 121, 1026–27). The DDS psychologists also opined that Amanda could
do "simple, routine work," R. 115; *see also* R. 101, "maintain attention and concentration for 2
hour periods to complete an 8 hour day," and "complete a full workweek with minimal
interruption from" her psychological symptoms, R. 120–21; *see also* R. 101. R. 25. Dr. Jackson
opined that Amanda "would have difficulty managing complex or simple tasks unless they were
specifically demonstrated for her," but that "[h]er emotions were under good control and she
[could] concentrate adequately." R. 1027. She did not identify any impairment-related limitations
on Amanda's ability to maintain concentration, persistence, or pace while doing "simple tasks"
during a normal workday or workweek. *See* R. 1026–27. ALJ Munday found these opinions
"partially persuasive" because they were supported by citations to specific evidence in the record
and consistent with other medical source's findings that Amanda exhibited normal behavior and
attention span on exams throughout the relevant period. *See* R. 25–26. Nonetheless, ALJ
Munday also found that Amanda had "slight social functioning restrictions" and should be
limited to "low stress" work because treatment notes showed that Amanda had "some difficulty
dealing with stressors and reported easy frustration and anger." R. 26.

3.      *Analysis*

ALJ Munday's written decision adequately explains how her step-three findings that
Amanda's severe mental MDIs caused "moderate" limitations in her broader abilities to interact
with others; maintain concentration, persistence, or pace; and adapt or manage herself factored

24

into her later RFC finding that Amanda could sustain "simple, routine tasks" and "low stress work, defined as occasional workplace changes," and manage "frequent interaction with the general public," R. 16. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662 (4th Cir. 2017). To start, Amanda does not explain why an RFC restricting her to only "occasional workplace changes," R. 16, does not reasonably reflect the ALJ's findings that, while Amanda had "problems" regulating frustration or anger and "handling stress and changes in routine," *id.* (citing R. 242–43, 1026), she was not "seriously limited" in her ability to adapt and manage herself "independently, appropriately, or effectively, and on a sustained basis," R. 15 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00).[6] An RFC restricting Amanda to "occasional" workplace changes logically accounts for her "moderate difficulties" dealing with the stress of unskilled work. *Cf. Carr v. Colvin*, Civ. No. TMD-15-685, 2016 WL 4662341, at *10 (D. Md. Sept. 7, 2016) (an RFC restricting the claimant to "only occasional contract with supervisors, co-workers, and the public account[ed] for [his] moderate difficulties in social functioning" (citations omitted)). Further, that specific work-place restriction corresponds to the DDS psychologist's medical opinion that Amanda "requires 'occasional assistance with changes,'" which ALJ Munday found to be supported by and consistent with other relevant evidence in the record. R. 25 (quoting R. 121). Amanda does not challenge this aspect of the ALJ's RFC assessment or point to any evidence in the record suggesting she had additional or more serious adaptation limitations than the ALJ found. *See generally Sheila W.*, 2020 WL 5525165, at *9.

ALJ Munday's decision also reasonably explains why, despite finding that Amanda's severe mental MDIs caused "moderate" limitations with social interaction and maintaining CPP,

---

[6] By definition, ALJ Munday's finding that Amanda had a "moderate" limitation in this area means Amanda still had "fair" functional ability, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c), to regulate her emotions, control her behavior, deal with routine changes, and maintain well-being in a work setting on a sustained basis, *see id.* § 12.00(E)(4).

Amanda retained the ability to interact with supervisors and co-workers—but was limited to "frequent interaction" with the public—and to concentrate on "simple routine tasks" during a normal workday, R. 18. *See Sizemore v. Berryhill*, 878 F.3d 72, 80–81 (4th Cir. 2017). First, she discounted Amanda's statements describing extreme problems getting along with people, R. 15, 17 (citing R. 241–43, testimony), because they were "not fully consistent with," R. 18, the "wide range" of social activities that Amanda reported to her own healthcare providers, *see* R. 18–19 (citing R. 906, 908, 980, 992, 1001, 1004, 1170), and clinicians' observations during the relevant time that Amanda exhibited "normal" or appropriate social behavior in one-on-one or small-group interactions, *see* R. 24 (citations omitted). Nonetheless, ALJ Munday also found that Amanda's testimony that she did not like "being around a bunch of people" because she worried that they would "judge" her and she got "frustrated too easy," R. 72, as well as her statements to providers that she was easily frustrated or got angry with people, supported "slight" social restrictions. R. 24–25; *see* R. 1026. In making that assessment, the ALJ relied on the medical opinions that found Amanda had "normal social skills," R. 25, and "no social functioning restrictions," R. 26. Thus, she limited Amanda to "frequent" interaction with the public. R. 18.

Amanda's only objection on this point is that ALJ Munday's RFC finding "indicates that she placed no limitation on [Amanda's] ability to interact with co-workers or supervisors." Pl.'s Br. 22 (citing R. 15–16). That is accurate. Amanda's record contained conflicting evidence about her social functioning and impairment-related social limitations in the workplace. *E.g., compare* R. 72, 241–43, 892–93, 1025–26, 1043 (alleged social limitations), *with* R. 767, 774, 903, 906, 959, 980, 992, 1001, 1004, 1033, 1036 (reported social activities and/or strengths), *and* R. 528, 532, 537, 543, 546, 550, 554, 753, 776, 785, 806, 820, 827, 895–96, 932, 1024, 1027, 1045, 1051, 1125, 1129, 1133, 1174, 1176, 1180, 1181–84, 1214, 1224–25, 1229–30 (treatment notes

26

showing Amanda was "pleasant," "cooperative," or "friendly"; had "good" or "direct" eye
contact; and/or otherwise exhibited "normal" or "appropriate" social behavior on exams). The
Court cannot "second guess the ALJ in resolving those conflicts," *Kenne v. Berryhill*, 732 F.
App'x 174, 177 (4th Cir. 2018), where, as here, the ALJ's justification for limiting Amanda's
interaction with the public, but not with supervisors or coworkers, allows the Court "to determine
that the ALJ performed an adequate review of the whole record and that the decision is supported
by substantial evidence," *id. Cf. Panna*, 2015 WL 5714403, at *3–4 (recommending reversal and
remand under *Mascio* where ALJ found claimant had overall "moderate" limitations in social
functioning, but subsequent RFC finding did not include any restrictions on social interaction).

ALJ Munday also explained why Amanda's "moderate" difficulties with CPP overall did
"not affect" her ability to "stay on task" while doing simple, routine work for a full workday and
normal workweek. *Mascio*, 780 F.3d at 638. She expressly relied on the DDS psychologists'
opinions that, notwithstanding her "moderate" limitations in that broad functional area, R. 98,
116, Amanda could do "simple, routine work," R. 115; *see* R. 101, "maintain attention and
concentration for 2 hour periods to complete an 8 hour day," and "complete a full workweek
with minimal interruption from" her psychological symptoms, R. 120–21; *see also* R. 101. *See*
R. 26 (citing R. 98, 101, 115–16, 120–21). ALJ Munday also discounted Amanda's testimony
that she had "a very hard time concentrating," R. 72; *see* R. 242, in part because those allegations
were inconsistent with clinicians' findings that Amanda routinely exhibited normal attention or
concentration on mental-status exams, R. 24 (citations omitted).

A psychologist's medical opinion that the claimant "would generally be able to maintain
attention for at least two hours at time as needed to do simple, routine tasks . . . on a sustained
basis," *Sizemore*, 878 F.3d at 80–81 (cleaned up), can "provide[] substantial support for the

ALJ's finding that, despite [the claimant's] overall moderate difficulties with concentration, persistence, or pace, he [or she] would nonetheless be able to *stay on task* while performing simple . . . tasks" in a low-stress environment, *id.* at 81 (quotation marks omitted). Amanda does not challenge ALJ Munday's reliance on the DDS psychologists' medical opinions. *See* Pl.'s Br. 22–23. ALJ Munday also reasonably relied on clinician's findings that Amanda exhibited "adequate," "intact," or "good" attention and/or concentration on mental-status exams, *see, e.g.*, 753–54, 785, 895, 1027, 1045, 1174, 1176, 1178, 1180, 1181–84, 1224–25, 1229–30, as one factor in rejecting Amanda's allegation that she could not stay on task for two-hour increments thought an eight-hour workday. *See* 20 C.F.R. § 416.929(c)(2)–(3). Again, Amanda does not point to any evidence in the record not considered by ALJ Munday suggesting that her ability to stay on task was more limited than the ALJ found. *See generally Sheila W.*, 2020 WL 5525165, at *9. Accordingly remand under *Mascio* is not warranted. *See Sizemore*, 878 F.3d at 80–81

C.    *Amanda's Daily Activities*

Finally, Amanda argues that ALJ Munday improperly considered the type of daily activities Amanda performed without also considering the "limited" or "intermittent" extent to which Amanda performed those activities on her own. *See* Pl.'s Br. 30–34. Evidence about a claimant's daily activities can play an important role in a proper RFC analysis. *See Hines*, 453 F.3d at 565–66; 20 C.F.R. § 416.929(c)(3)(i). Nevertheless, "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). If necessary, the ALJ also should explain how "those particular activities" show the claimant "could persist through an eight-hour workday" five days a week. *Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251, 263 (4th Cir. 2017).

28

Amanda's record contains conflicting and contradictory evidence about the nature and extent of her daily activities during the relevant time. In June 2019, Amanda reported to DDS that she needed physical help bathing, dressing, and feeding herself, R. 238–29; that she did not cook for herself or "do any" household chores, but that a friend helped her do chores "once a week," R. 239; that she left her house only to check the mail, for medical appointments, or to go grocery shopping once a month, and she needed someone to accompany her on those outings because she might fall, R. 240–41. In September 2020, Amanda testified that she could "hardly do anything around the house," R. 59, but she could do some light cleaning if she took breaks or had help, R. 73. She stayed in bed "at least four days a week." R. 67. Amanda testified that Jaleesa picked her up at home twice a week and took her "out in the community" to run errands, go to doctor's appointments, and work out at Planet Fitness, R. 66–70, but she denied ever going to the Science Museum or taking any "skill building classes" during the relevant time, *see* R. 69–70. Amanda stopped going to Planet Fitness in the fall of 2019 because her insurance reduced Jaleesa's hours. R. 69. It was "kinda hard for [her] to go" to the gym in 2020 because she did not "have transportation[,] for one, and then the places are limited because of COVID." R. 66.

Amanda's statements to her healthcare providers, as well as Jaleesa's progress reports, paint a different picture of Amanda's daily activities during the relevant time. In August and September 2019, Amanda reported that her regular activities included working out at the gym "every morning," R. 959; *see* R. 980, preparing "home cooked meals" weekly, R. 906, cleaning her apartment and doing laundry once or twice a week, R. 908, and going to food banks, R. 904. She also attended "We Care about once or twice a week, [took] a computer class when it is available, attend[ed] church occasionally, . . . and [went] places with her friends where she interact[ed] with others." R. 906. In September, Amanda "reported she [was] now treasurer for

We [C]are and [would] also be helping with taking notes for the meetings." R. 980. By October, Amanda was "attending [two] classes at the science museum" and still worked out "three times a week." R. 992. She had also "been working on organizing her home and cleaning it daily." *Id.* In November, she reported "attend[ing] a class for the past six weeks [on] Life Skills Training," R. 1001, at Southern Area for Aging, R. 1004. That December, Jaleesa noted that Amanda did "not isolate herself and love[d] to be out in the community weekly." R. 1033. She still attended We Care twice a week, usually went "on community outings with program," and she had "started back exercising about 1 to 2 times a week." R. 1036. In January 2020, Amanda reported that her house was messy because she got overwhelmed and let clutter pile up, but "she will eventually get motivated and clean everything." R. 1027. That August, Jaleesa noted that Amanda could "care [for] her pet and cook her own meals." R. 1227.

ALJ Munday's decision contains a fair, accurate summary of the relevant evidence. *See* R. 15–19. She acknowledged that Amanda described very limited household chores and received some "one-on-one" support with certain activities a few times a week, R. 22–23, but nonetheless "reasonably chose to credit" other relevant evidence indicating that Amanda's functioning was higher than she alleged, *Dinges v. Colvin*, No. 5:14cv32, 2015 WL 3467024, at *9 (W.D. Va. June 2, 2015). Moreover, unlike the ALJ in *Brown*, ALJ Munday did not rely on "minimal" daily activities, *Tina B. v. Comm'r of Soc. Sec.*, No. 7:21cv212, 2022 WL 6627121, at *6 (W.D. Va. Aug. 1, 2022) (citing *Brown*, 873 F.3d at 269), *adopted sub nom. Bonds v. Kijakazi*, 2022 WL 4003866, at *1–2 (W.D. Va. Sept. 1, 2022), to show that Amanda could do light, unskilled for eight hours a day, five days a week, R. 19, 23–24. Rather, the ALJ cited Amanda's reports that she cleaned her home, attended classes occasionally, worked out regularly, and participated in community outings during the relevant time "as only one factor" in explaining why Amanda's

medical conditions were not as debilitating as she alleged in her testimony. *See Tina B.*, 2022 WL 6627121, at *6 (citing *Ladda v. Berryhill*, 749 F. App'x 166, 173 n.4 (4th Cir. 2018)). Accordingly, I find no reversible error in ALJ Munday's evaluation of Amanda's daily activities.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** Amanda's motion for summary judgment, ECF No. 16, **GRANT** the Commissioner's motion for summary judgment, ECF No. 18, **AFFIRM** the Commissioner's final decision denying Amanda's claim for SSI benefits, and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: November 28, 2022

Joel C. Hoppe
U.S. Magistrate Judge